IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RYAN TAYLOR NICHOLS (01) | No. 1:21-cr-117 (TFH) |

**GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

This Court should deny defendant Ryan Taylor Nichols's motion to dismiss all charges against him based on recent remarks by President Biden, which, he claims, have "irreparably poisoned the jury pool." ECF 155 at 1. Nichols fails to establish that he cannot obtain a fair and impartial trial in this district, much less that the proper remedy should be dismissal.

## BACKGROUND

At 1:00 p.m. on January 6, 2021, a Joint Session of the United States Congress convened in the United States Capitol building. The Joint Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election. With the Joint Session underway and with Vice President Mike Pence presiding, a large crowd gathered outside the U.S. Capitol. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over erected barricades. The crowd, having breached police officer lines, advanced to the exterior façade of the building. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol. At approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.

Nichols had traveled to Washington, D.C. earlier, after posting calls for violence on social media. On January 5, 2021, he joined a crowd yelling at police officers near the White House. On January 6, Nichols outfitted himself with tactical gear and a crowbar, and posted that it was "[t]ime to take the country back." That afternoon, Nichols marched to the U.S. Capitol while livestreaming an expletive-laden, threatening tirade. Once on Capitol grounds, Nichols made his way to the inauguration stage, which was in the process of being constructed on the Capitol's lower west terrace and where law enforcement battled to protect an entrance to the building referred to as "the tunnel." As Nichols marched toward the tunnel at approximately 3:16 p.m., rioters continued to attack law enforcement, pulling away protective shields, and throwing projectiles at officers. Nichols and his codefendant, Alex Harkrider, lowered their heads and shoulders and joined the mob, heaving against the line of officers.

Over the following two minutes, the officers managed to push the rioters, including Nichols and Harkrider, out from inside of the tunnel. Later, Nichols pushed his way back toward the police line, standing immediately in front of the law enforcement line guarding the tunnel entrance and waving the mob forward toward police. As captured on multiple videos, Nichols then signaled to another rioter to pass him an OC canister, which Nichols took and positioned over the officers' riot shields. Nichols then dispersed the spray twice onto the officers, who lowered their heads to avoid the spray. After assaulting the officers with the OC spray, Nichols remained near the front line of rioters for several minutes as other rioters hung from the top of the tunnel swinging and stomping at the officers.

Between approximately 4:10 and 4:15 p.m., Nichols watched as small window into the Capitol near the tunnel is broken. Nichols was one of the first people to climb through it into a

conference room inside the Capitol. Once inside, Nichols and Harkrider barricaded the doors with desks and chairs.

Shortly thereafter, Nichols crawled to the edge of a window near the tunnel, crowbar in hand, and began speaking to others in the crowd through a bullhorn, yelling such things as "Get in the building!"; "This is the second revolution right here folks!"; and "If you are prepared to fight, you need to get your weapon!" Throughout these events, Nichols celebrated his conduct on social media with a variety of posts. He also continued to post calls for violence in the waning hours of January 6, 2021. He subsequently destroyed evidence, such as by deleting his Facebook posts and text messages.

For this conduct, the grand jury charged Nichols with civil disorder, in violation of 18 U.S.C. § 231(a)(3); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); assaulting, resisting, or impeding officers using a deadly or dangerous weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); entering and remaining on restricted grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); disorderly and disruptive conduct on restricted grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); disorderly conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); act of physical violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F); and parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). ECF 59, Superseding Indictment.

In addition to the instant motion to dismiss (ECF 155), Nichols has filed several pretrial motions, including a motion to join, adopt, and supplement (ECF 132) Harkrider's motion seeking a change of venue (ECF 92), and a supplement to that motion based on President Biden's September 1, 2022, speech (ECF 157).

## ARGUMENT

Nichols now moves to dismiss all of the charges against him in light of nationally televised remarks by the President of the United States on September 1, 2022, arguing that those remarks "intentionally and irreparably poisoned the jury pool." ECF No. 155 at 1. Nichols's motion fails for several reasons.

As an initial matter, Nichols cites no authority for the proposition that pretrial publicity can reach such an extent that a case should be dismissed rather than transferred to another venue.[1] Indeed, Nichols cannot point to a single case in our nation's history that has been dismissed—as opposed to transferred to another venue—because of concerns about juror partiality. To the contrary, courts have declined even to transfer venue (much less dismiss the charges) in some of the most high-profile prosecutions in recent American history. *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling v. United States*, 561 U.S. 358, 399 (2010) (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides). And even in *United States v. McVeigh*, 918 F. Supp. 1467, 1471 (W.D. Okla. 1996), which involved an act of domestic terrorism that killed 169 people, the district court transferred venue to an adjoining state; it did not dismiss the indictment entirely.

---

[1] Nor does Nichols attempt to reconcile his request for dismissal with his representation in a separate filing that an impartial jury can be found in the Eastern District of Texas. ECF 157 at 4.

**Government's Opposition to**
**Defendant's Motion to Dismiss—Page 4**

Nichols fails to explain how the President's remarks make his case more difficult to obtain an impartial jury than other high-profile cases involving acts of violence.

Furthermore, Nichols cannot show that the President's remarks would justify even a change of venue. Mere exposure to information about the merits of a criminal case does not disqualify a person from jury service. More than 140 years ago, the Supreme Court observed that "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878). And that court has made clear that the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," does not require a change of venue. *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* There is simply no reason to believe that 12 such jurors cannot be found in this District.

The D.C. Circuit held that a change of venue was not required in cases arising from the Watergate scandal, despite the fact that some of the publicity was "hostile in tone and accusatory in content." *United States v. Haldeman*, 559 F.2d 31, 61 (D.C. Cir. 1976) (en banc) (per curiam). The court observed that much of the pretrial publicity was "national in . . . reach" and that "[s]candal at the highest levels of the federal government is not simply a local crime." *Id.* at 64 n.43 (D.C. Cir. 1976). But the court found that venue was nevertheless appropriate in the District of Columbia, and it did not suggest that national coverage required dismissal of the case. *Id.* at 61.

**Government's Opposition to**
**Defendant's Motion to Dismiss—Page 5**

Additionally, Nichols fails to account for the important role of voir dire in selecting an impartial jury. The primary safeguard of a defendant's right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam). "[V]oir dire has long been recognized as an effective method of routing out [publicity-based] bias, especially when conducted in a careful and thoroughgoing manner." *In re Nat'l Broadcasting Co.*, 653 F.2d 609, 617 (D.C. Cir. 1981). After a careful voir dire, this Court can select a jury from those residents who either did not watch the President's remarks or who, despite having watched the remarks, give adequate assurances of their impartiality. *See Haldeman*, 559 F.3d at 62 n.35 (rejecting claim of prejudice even though "several jurors" had "seen portions of the televised Senate hearings" related to Watergate).

The sole legal authority cited by Nichols, *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986), does not support dismissal. ECF 155 at 4. *Thomas*, a case from the U.S. Court of Military Appeals (now the Court of Appeals for the Armed Forces), involved several individual challenges to court-martial proceedings based on comments made by a general. The general stated, among other things, that he found it paradoxical for a unit commander to recommend that an accused be tried by court-martial and then later appear as a defense character witness at sentencing and recommend that the soldier be retained and not discharged. *Id.* at 391-92. Based on these comments, commanders, first sergeants, and people from an accused's unit were

ordered not to give favorable presentencing testimony on behalf of an accused. *Id.* at 392. Although the Court of Military Appeals found that the general's comments (and the way they were interpreted and implemented) constituted unlawful command influence over the unit, the court also found that the trial courts took sufficient remedial measures in each case to eliminate any prejudicial impact of the general's influence on the proceedings, and expressly rejected the notion that a "more drastic action, such as automatic reversal of the findings and sentence, is required." *Id.* at 393, 397-99.

If anything, *Thomas* supports the government's position that a proper voir dire can eliminate any unfair prejudice resulting from the President's speech and that, therefore, this case should not be dismissed. The President did not mention Nichols or any other January 6th rioter by name, let alone instruct citizen what to do if selected as a juror in one of their cases. Moreover, any potential juror who, as the defense suggests, interpreted the President's comments as "demand[ing] betrayal of [the] juror's oath" and was inclined to convict a January 6 defendant out of blind obedience to the President can be ferreted out during voir dire, ensuring that the defendant receives a fair trial.

## CONCLUSION

WHEREFORE, the Government respectfully requests that the Court deny Nichols's Motion to Dismiss.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

 */s/ Douglas B. Brasher*
DOUGLAS B. BRASHER
Assistant United States Attorney
Texas State Bar No. 24077601
Federal Major Crimes – Detailee
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone:  214-659-8604
douglas.brasher@usdoj.gov

SARAH W. ROCHA
Trial Attorney
D.C. Bar No. 977497
219 S. Dearborn Street, Fifth Floor
Chicago, Illinois 60604
Telephone:  202-330-1735
sarah.wilsonrocha@usdoj.gov