## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-117 (RCL)** |
| **RYAN TAYLOR NICHOLS,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court vary upwards to sentence Ryan Taylor Nichols to 83 months' incarceration, 3 years of supervised release, restitution in the amount of $2,000, a fine, and a special assessment of $100 per felony count of conviction.

## I.    INTRODUCTION

The defendant, Ryan Nichols, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.9 million in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Nichols, a business owner and former Marine, planned for "actual battle" in his preparations leading up to January 6, 2021. He proclaimed on Facebook that "we're bringing the wrath of God, and there's not a FUCKING thing you can do to stop it," "If Pence doesn't do the right thing, WE FIGHT," and other similar messages and postings. He followed through on his claims by gathering weapons, and other supplies, as well as recruiting his friend, and now co-defendant, Alex Harkrider to join him.

On January 6, Nichols wore a ballistic plate in a plate carrier and other tactical gear and armed himself with a crowbar. On his march to the Capitol, Nichols unleashed a profanity laden tirade against Vice President Mike Pence and others after learning that the Vice President had not agreed to block the certification of the Electoral College vote: "I'm telling you if Pence caved, we're gonna drag motherfuckers through the streets. You fucking politicians are going to get fucking drug through the streets." He witnessed horrific violence against officers by other rioters, but still personally engaged in violence at the Capitol: he pushed with the crowd against officers in the tunnel in front of the Lower West Terrace Doors and Nichols hit multiple officers in the tunnel with two streams of OC spray using a stolen MPD cannister. He also entered and exited the Capitol through a broken window and instructed the crowd through a bullhorn to get their weapons to prepare for sustained, armed resistance against the police and military officials who were coming to secure the Capitol.

The evening of January 6, Nichols posted a video of himself in his hotel room stating, "I'm calling for violence! And I will be violent!" He ended the video by stating, "I will fucking die for this. But before I do that, I plan on making other people die first, for their country, if it gets down to that." When Nichols returned home, he burned the clothing he wore to the Capitol, deleted

evidence from his cell phone and social media, and instructed his co-defendant Harkrider to delete messages.

The government recommends that the Court sentence Nichols to 83 months of incarceration. An 83-month sentence reflects the gravity of Nichols' violent conduct and his consistently violent rhetoric before, during, and after January 6.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021, Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 280, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.   Nichols' Role in the January 6, 2021, Attack on the Capitol

#### *Calling for Violence in the Wake of the 2020 Presidential Election*

In Facebook posts following the 2020 Presidential election, Nichols repeatedly claimed that the election was fraudulent, called for "war" against his fellow citizens, described those who voted for President Biden as "true traitor[s] to the country," and announced his intention to be in D.C. on January 6th to "FIGHT" if Vice President Pence did not block the certification of the Electoral College vote.

- Excerpt from December 12, 2020, messages: "If peaceful courtrooms won't hear the case, then it's time for American people to decide how important their country is to them being run by the right people. The time has come to start thinking about TAKING the country back, and pushing out anyone BY FORCE who doesn't want what's best for this country."

- Excerpt from December 14, 2020: "I've had hating ass people all weekend to shame me for feeling patriotic and taking a stand against the domestic terrorism I currently plaguing our country. […] So just because you got 'voted' in (with Dominion voting software 😳) doesn't mean we're going to listen or follow a fucking thing you say. We aren't shutting down. We aren't going to back down. We aren't giving up the 2nd

amendment. We WILL be heard. If you won't hear us in court peacefully, then you'll hear us in the streets non-peacefully. The patriots are giving you a chance (government) to do it correctly. If you don't we will do it ourselves."

- On December 24, 2020, Nichols posted the following messages and image:

  o "Any Democrat found guilty of treason should be executed.. Any Republican found guilty of treason should be VIOLENTLY executed!"

  o "It'll be fixed January 6th, or the Patriots will fix it ourselves.. When the Patriots move to fix it, we're bringing the wrath of God, and there's not a FUCKING thing you can do to stop it."

  o
  

- December 28, 2020: "Patriots about to show their WAR face within 7-10 days"

- December 28, 2020: "The time for games is OVER.. Patriots will be in Washington DC on Jan 6th! If Pence doesn't do the right thing, WE FIGHT"

- December 30, 2020: "On Jan 6th, the Patriots of this country will have a decision to make.. Mine has already been made.. What is yours?"

*Planning for Violence on January 6, 2021*

Text messages between Nichols and his co-defendant, Alex Harkrider, reveal Nichols was planning for violence on January 6, 2021, and recruiting Harkrider to join him. On December 12, 2020, Nichols wrote to Harkrider: "The time is coming . . . we, as patriots, may have to take back the country by force." On December 27, 2020, Nichols wrote "Are you ready bro? 1775 is about to go down in this bitch […]" and "We've got front seat tickets to the REAL revolution[.]"

On January 1, 2021, Nichols sent Harkrider an image and a hyperlink to body armor with pricing information. He sent several text messages including, "We're going to need first aid kits and tourniquets,"; "I need to speak with you in person"; "Everything is ok. Just need to gameplan lol"; "We need to speak in person lol"; "what I'm about to relay can't be done over the phone."

On January 3, 2021, they continued their planning:

**Nichols: Dad and I are building a gun container in the truck today**
**Nichols: Just know I have intel that Washington will be a warzone**
**Nichols: Big possibility that actual battle goes down**
Harkrider: I'm looking forward to it
**Nichols: I know how to get guns legally into DC now**
**Nichols: It's called transporting**
Harkrider: I'll bring every freedom blaster I own then
Harkrider: We're stopping in Kentucky on the way for those plate carrier too right?
**Nichols: Do you have any 10 round mags for an AR?**
Harkrider: I do not
**Nichols: Damn. I'd rather go with those so it's fully legal. 30 round mags are not**
Harkrider: Surely we can find some

Nichols and Harkrider each brought two firearms with them on their trip, transporting them in a box that Nichols and another individual specifically constructed in the back of Nichols' truck for the trip and transport to Washington, D.C.

***Confronting Law Enforcement in Washington, D.C. on January 5, 2021***

On the evening of January 5, 2021, Nichols and Harkrider joined a large group near the White House in downtown Washington, D.C., and Nichols recorded the events on a GoPro camera. *See* Exhibit A. Videos recorded by Nichols and others show Nichols in a large crowd that evening, saying, "[C]ops don't know what's going on. Too many of us, not enough of them," *id.* at 00:10-18, and then a short time later yelling out to another rioter, "Those people in fucking Capitol building are our enemy," *id.* at 00:59-END. Shortly thereafter Nichols, Harkrider, and others confronted MPD officers, and it appears Nichols yelled at least three times, "You can't stop what's coming tomorrow!" Exhibit B at 00:29-46. The MPD officers ordered the crowd, including Nichols, to stay back, but they did not comply and eventually the officers released crowd control spray. Nichols then yelled at the officers, "Hey you all start spraying me, I'm going to start whooping ass around here." *Id.* at 01:20. Shortly thereafter, Nichols was captured on video yelling at the MPD officers:

> Now you lost everybody on both sides.…. Because you don't want to fucking protect the Constitution. So you lost both sides of support. We had your fucking back, but we ain't got your back no more! We're the business owners! We're the veterans! ... We had your back! But we ain't got your back no more! ...Because you don't got our back! So we had your back until you didn't have ours! And so now you don't have ours! So now, I'm a Marine and we got other Marines around here! We ain't got your back no more! You better have our back and you better have our back or we're gonna fucking show you! Heads will fucking roll! We will not be told 'no' any longer!

Exhibit C at 0:36-1:30.

***Threatening Tirade on the March to the U.S. Capitol on January 6, 2021***

On the morning of January 6, 2021, Nichols outfitted himself with tactical gear. He wore a camouflage Marine Corps boonie hat, body armor consisting of a carrier with a ballistic plate, distinctive yellow-leather gloves, and steel-toed boots. He also carried a crowbar and a walkie-

talkie radio. The photograph of Harkrider and himself that he posted to Facebook shows how he was dressed at the beginning of the day:



*Image 1: Nichols, left, in photo with Harkrider, right, the morning of January 6, 2021.*

While attending the rally, Nichols posted an image of another rally attendee's sign to Facebook which contained the implicit threat of violence of a coming "second revolution." *See* Image 2.



*Image 2: Nichols post from the "Stop the Steal" rally of another attendee's sign, which he echoed with own caption.*

After listening to the speeches at the Ellipse, at approximately 1:40 p.m., Nichols livestreamed his and others' march to the Capitol on Facebook. *See* Exhibit D.



*Image 3: Screenshot from Exhibit D at 07:53: Harkrider, to left and behind,*
*with Nichols, center, marching with crowd to the Capitol.*

As he marched, Nichols unleashed an eighteen-minute, expletive-laden, threatening tirade, stating, among other things:

- "I'm hearing reports that Pence caved. I'm telling you if Pence caved, we're gonna drag motherfuckers through the streets. You fucking politicians are going to get fucking drug through the streets. Because we're not going to have our fucking shit stolen. We're not going to have our election or our country stolen… Because it's the second fucking revolution and we're fucking done. I'm telling you right now, Ryan Nichols said it... You think we patriots are here for no reason? You think we came just to fucking watch you run over us? No. No. You want to take it from us, motherfucker we'll take it back from you."

- "So we're going to fucking fight and we're going to take back what is ours. And if you are patriot, then get on board and if you're not then get the fuck out of my way, because I'll drag your fucking ass through the street. You want it? You fucking got it. So let me find out Pence let me find out myself that you treasoned the country, we'll fucking drag your ass too."

- "We ain't taking it no more. So you want to take it from us, well we're here to take it back from you." At this point, Harkrider yells, "Cut their freaking heads off … You can do it." Nichols agrees yelling, "Cut their heads off. Hey Republican protestors are trying to enter the House right now at the Capitol is the word that I'm getting. So, if that's true, then get up in there. If you voted for treason, we're going to drag your ass through the streets."

- A woman chimes in, "We're really nice people actually." Nichols promptly corrects her: "We're nice people but when you treason our country, we'll drag your ass. They're not veterans, we are. She's not a fighter, I am. Everybody here ain't here to fight. I am."

- Nichols chants, "Lock and load, lock and load, lock and load."

- "Know that Ryan and Alex are here in Washington, D.C., marching on the Capitol, apparently Pence just caved and if Pence caved we're going to fucking take it back, because we're not going to let it be stolen. So we're up here fighting."

### *Violent Conduct at the U.S. Capitol*

Nichols approached the Capitol Building through the West Front, one of the most violent and chaotic areas during the riot where rioters clashed directly with police, the police were forced to retreat up on to the Lower West Terrace and into an area known as the tunnel. Inside of that tunnel, one of the most prolonged and violent confrontations between rioters and police took place.

Once on Capitol grounds, Nichols marched up to the Lower West Terrace and toward the tunnel. Rioters inside and outside of the tunnel on the Lower West Terrace continued to attack law enforcement, pulling away protective shields, assaulting officers with improvised weapons and chemical spray, and throwing projectiles at officers. At 3:18 p.m., shortly after Nichols arrived on the Lower West Terrace, MPD Officer Michael Fanone was pulled from the tunnel and viciously assaulted by the mob, including being tasered, within feet and in the direct line of sight of Nichols. In spite of seeing this violent assault and knowing the very real dangers that officers in the tunnel were in, Nichols and Harkrider marched up the stairs towards the tunnel, lowered their heads and shoulders, and joined the mob, heaving against the line of officers in synchronized movements such that the officers in the tunnel had to resist the entire weight of the mob pushing against them at once. *See* Image 4. The officers in the tunnel, despite the overwhelming numbers of the mob— were able to push the rioters—including Nichols, back down the stairs.



*Image 4: Nichols, circled in yellow in bottom right corner, and
Harkrider, indicated by red arrow pushing against officers in the tunnel.*

Yet, despite being repelled once, Nichols was undeterred in his resolve to breach the
Capitol and stop the certification process. At approximately 4:02 p.m., Nichols pushed his way
back toward the police line, standing immediately in front of the law enforcement line guarding
the tunnel entrance and waving the mob forward toward police. Nichols signaled to another rioter
to pass him a large canister of chemical spray that rioters had stolen from MPD officers. *See*
Exhibit E. Nichols grabbed the canister and positioned it over the officers' riot shields.



*Image 5: Screenshot from Exhibit E at 00:27: Nichols spraying officers.*

Nichols, moving the spray cannister left to right to maximize the number of officers he struck, then dispersed the spray twice onto the crowd of officers, including Officer I.D. *See* Exhibit F (side-by-side comparison with video in Exhibit E and view from inside the tunnel). At the moment that Nichols sprayed Officer I.D. and the other officers in the tunnel, they were sustaining the latest synchronized push from the rioters and were actively under physical assault from other rioters. Nichols' aerial chemical assault was intended to impede the officers' ability to resist the mobs' collective assaults against them, thus allowing the rioters to overrun them and permit thousands of rioters to pour into the building through the tunnel. After assaulting the officers with the OC spray, Nichols remained near the front line of rioters for several minutes as other rioters swung and stomped at the officers.

Between approximately 4:10 and 4:15 p.m., Nichols watched as rioters broke a small window near the tunnel that they used to breach room ST-2M. He joined them and was one of the

first rioters that climbed through the broken window. Shortly thereafter, Nichols crawled to the edge of a window near the tunnel, crowbar in hand, and yelled to the crowd through a bullhorn.



*Image 5: Nichols, center, holding a crowbar in his right hand and bullhorn in his left hand on ledge of window outside Room ST-2M.*

Waving his crowbar, Nichols yelled, repeatedly, among other things: "Get in the building! Get in the building! This is your country… We will not be told no! …Get in there!"; "This is the second revolution right here folks!"; and "This is not a peaceful protest!" Nichols next excoriations to the crowd were—considering that Nichols and Harkrider had a cache of weapons stored across the river at their hotel in Virginia—most ominous: "If you have a weapon, you need to get your weapon! If you have a weapon, you need to get your weapon[.]" and "If you are prepared to fight, you need to get your weapon!" *See* Exhibit G.

At approximately 4:39 p.m., Nichols was captured on video standing on a ledge above the tunnel, crowbar in hand, motioning the crowd toward the Capitol and yelling "This is our country! This is our country!" Exhibit H at 00:35-00:45.



*Image 6: Screenshot from Exhibit H at 00:38: Nichols, center,*
*holding a crowbar above his head while shouting to crowd on ledge.*

Exhibiting pride in his conduct in Washington, throughout the day on January 6, Nichols

documented his conduct on social media:



*Image 7: Nichols celebrates his breach of the secure perimeter with Facebook post saying "We're in" followed by*
*two American flag emojis, a photo on a ledge with a crowd of rioters behind him, and a photo with Harkrider in*
*front of the Capitol building.*



*Image 8: Nichols post with Harkrider from the Lower West Terrace in which he states that he "is [..] feeling pissed off" and threatening civil unrest.*

### Calls for Further Violence Following the Riot

In the waning hours of January 6, 2021, Nichols took to social media to call for more violence, proclaim himself a leader of the "revolution," and to ask others to join him in further violent resistance against the elected government of the United States. At 8:13 pm on January 6, 2021, Nichols posted a nearly 11-minute video to Facebook, titled "Are Patriots Calling For Violence? Why Weren't You Here? WE HAVE TO TALK!" *See* Image 9; *see also* Exhibit I.



*Image 9: Screenshot from Exhibit I at 09:34: Nichols' evening Facebook livestream.*

In this video, which he livestreamed from his hotel room, Nichols recounted the day, his criminal conduct, and his desire for further violence:

- "Pence did the wrong thing and allowed them to continue with the vote. So we stormed the Capitol building, and they stopped the vote. And they went down into the tunnels and hid, like the fucking cowards that they are. Instead of coming out there and addressing 'we the people' they ran. Because they knew they were doing the wrong thing. So we clashed with Capitol Police."

- "So if you want to know where Ryan Nichols stands, Ryan Nichols stands for violence!"

- "Ryan Nichols is done allowing his country to be stolen and I understand that the first revolutionary war folks, it was violent. We had to be violent and take our country back. Well guess what? The second revolutionary war. Right now, the American revolutionary war that's going on right now. It started today."

- "It's going to be violent. And yes, if you are asking is Ryan Nichols going to bring violence? Yes, Ryan Nichols is going to bring violence."

- "And if you're looking for a leader, I'll be your leader! If you're looking for guidance in this second American revolution, I will be your leader! Come seek me out. I will tell you where I'm going to be, what I'm going to be doing, Alex will be doing it, we will be with other veterans, other patriots, and we're here to take this country back."

- "So, yes, I'm calling for violence! And I will be violent! Because I've been peaceful and my voice hasn't been heard! I've been peaceful and my vote doesn't count! I've been peaceful and the Courts won't hear me. So you're fucking right, I'm going to be violent now! And I'm here in Washington, D.C. and it just got started. We shut down the vote today, because those coward ass politicians ran into the tunnels when we stormed the Capitol. I was inside the Capitol today. I was in the Capitol Building. I've got pictures from insides and videos from inside the Capitol Building." [2]

- "I've seen the last of you treasonous, bastard, elected politicians, stealing our country! So I don't care if I have to die for it. Give me liberty or give me death! But I'm prepared to fucking die for this! I took a constitutional oath, to uphold for the United States and its people, for all enemies, foreign and domestic. So help me god. I will fucking die for this. But before I do that, I plan on making other people die first, for their country, if it gets down to that."

---

[2] Nichols apparently deleted this evidence, as he also deleted text messages with and his co-defendant, wife, and father.

- "So, yes today. Ryan Nichols. Ryan Nichols grabbed his fucking weapons [*holds up and waves crowbar*] and he stormed the Capitol and he fought for freedom! For [unintelligible] election integrity. I fought. I stormed up there against police and I pushed them back."

Nichols' reference to reorganizing was not idle chatter. Indeed, on January 7, Nichols had a conversation on Facebook where he discussed "recruiting more patriots today" and stating that he "did get frustrated last night, but I'll never give up." He then went on to say, in an apparent reference to the upcoming inauguration, that "[i]t's time to get better organized and regroup for the 20th." Nichols continued, referring to his belief that the election was stolen: "Everyone deserves to stand trial. If found guilty, then death. Because the crime is treason. Not theft." In the same conversation, Nichols acknowledged he was aware that he had been "reported to FBI". The other user responded that he could not "find anywhere we've stepped outside the law." Nichols responded, "Even entering the Capitol?" "And clashing with police as they sprayed and beat us?" Nichols then opined, "I think what happened NEEDED to be done. If not then, then never. I did what I felt God told me to do. What was laid upon my heart. To go defend this nation and it's (*sic*) integrity."

### Nichols' Conduct After January 6

As evidenced by Nichols' Facebook comments, he was aware that the FBI was likely looking for him. Nevertheless, Nichols deleted some of his Facebook posts and messages. He also deleted all the text messages between himself and his co-defendant from his phone and twice directed Harkrider to do the same. Nichols texted Harkrider on January 8, 2021, "Delete it all, including our text conversation together. Also delete them from your phone as well." The next day, on January 9, 2021, he directed Harkrider to "Watch the video and then delete what you have."

When Nichols' phone was searched, it was missing all text messages between himself and his wife, his father, and other threads (some of which remained on and were later recovered from Harkrider's phone). Nichols further destroyed or secreted other evidence from January 6, 2021, including the tactical vest he wore that day, his hat, the ballistic armor plate he wore, the yellow

gloves, the walkie-talkie he carried, and the crowbar, none of which were located during a search of his residence.

## III.   THE CHARGES AND PLEA AGREEMENT

Nichols was first charged by complaint on January 17, 2021. On November 10, 2021, a federal grand jury returned a superseding indictment charging Nichols with eight counts, including, (1) civil disorder in violation of 18 U.S.C § 231(a)(3); (2) obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), and 2; (3) assaulting a law enforcement officer with a deadly or dangerous weapon (OC spray), in violation of 18 U.S.C. § 111(a)(1) and (b); (4) entering a restricted building or grounds while using and carrying a deadly and dangerous weapon (crowbar and OC spray) in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); (5) engaging in disorderly and disruptive conduct on restricted ground while using and carrying an deadly and dangerous weapon (crowbar and OC spray), in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); (6) disorderly and disruptive conduct in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(D)); (7) engaging in an act of physical violence on Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F); and (8) parading, picketing, and demonstrating in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G). Superseding Indictment, ECF No. 59.

On November 7, 2023, Nichols was charged by information with one count of Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 2, and one count of Assaulting, Resisting or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1), *see* ECF 262, and was convicted of both counts based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Nichols now faces sentencing on one count of Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 2, and one count of Assaulting, Resisting or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the Presentence Report ("PSR") issued by the U.S. Probation Office, Nichols faces up to 20 years of imprisonment for Obstruction of an Official Proceeding and Aiding and Abetting and eight years of imprisonment for Assaulting, Resisting or Impeding Certain Officers. *See* PSR at ¶¶111-112. For both offenses, Nichols faces up a term of supervised release of not more than three years and restitution, and for each offense a fine up to $250,000, and a mandatory special assessment of $100. *Id.* at ¶¶118-119, 133-134, 137.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

### A.    Guidelines Calculation

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶¶ 69-70. A draft PSR originally calculated Nichols' total offense level, after acceptance of responsibility, as 28, resulting in a Guidelines imprisonment range of 78 to 97 months' imprisonment. Draft PSR at ¶¶ 67 & 113. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation in the first PSR. ECF 297 ("Plea Agreement"), ¶ 4(A).

However, between the filing of the Draft PSR, the PSR, and this sentencing memo, the D.C. Circuit decided *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024). *Brock* held that the term "administration of justice," as used in U.S.S.G. § 2J1.2, does not

apply to Congress' certification of electoral college votes. *See id*. at *8. Accordingly, the enhancement in U.S.S.G. § 2J1.2(b)(2), which requires a three-level enhancement "[i]f the offense resulted in substantial interference with the administration of justice" does not apply where a defendant interfered solely with the certification of electoral college votes. U.S.S.G. § 2J1.2(b)(2); *Brock*, 2024 WL 875795, at *15. This holding also precludes application of the eight-level enhancement in U.S.S.G. § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," to defendants who interfered solely with Congress' certification of electoral college votes. Because the Draft PSR applied both enhancements in calculating Nichols' total offense level of 28, that calculation is no longer accurate.[3]

The U.S. Probation Office's updated PSR, received April 25, 2024, instead calculates the defendant's total adjusted offense level at 21, after a three-level decrease for acceptance of responsibility. PSR at ¶¶56-67. Accordingly, the PSR calculates the Guidelines imprisonment range as 37-46 months' imprisonment. However, in addition to removing the two enhancements from Count One that would no longer be applicable post-*Brock* (U.S.S.G. § 2J1.2(b)(2) and § 2J1.2(b)(1)(B)), the PSR incorrectly fails to include two enhancements agreed-upon in the Plea

---

[3] The Government addresses the accuracy of the PSR's Guidelines calculations in light of *Brock* because the PSR's updated calculations differ from the Estimated Guidelines Range calculated in the Plea Agreement and the "parties also reserve[d] the right to address the correctness of any Sentencing Guidelines calculations determined by the presentence report writer or the court, even if those calculations differ from the Estimated Guidelines Range calculated" in the Plea Agreement. PSR at ¶6. The Government anticipates that the Court will have inquiries about post-*Brock* Guidelines calculations for 18 U.S.C. § 1512(c)(2) convictions, as it had in at least one post-*Brock* sentencing, *United States v. Erik Scott Warner, Felipe Antonio "Tony" Martinez, Derek Kinnison, and Ronald Mele*, 21-cr-392, and "[i]n the event that the Court or the presentence report writer considers any Sentencing Guidelines adjustments, departures, or calculations different from those agreed to and/or estimated in [the Plea] Agreement… the parties reserve the right to answer any related inquiries from the Court or the presentence report writer" PSR at ¶6.

Agreement, which are applicable to Nichol's conduct. The accurate post-*Brock* calculations would be as follows (enhancements left out of the PSR in **green highlight**):[4]

<u>Count One – 18 U.S.C. §§ 1512(c)(2) and 2</u>

| | | |
|---|---|---|
| USSG §2J1.2(a) | Base Offense Level | **14** |
| **USSG §3A1.2(c)**[5] | **Official Victim (Substantial risk of serious bodily injury)** | **+6** |
| | Count 1 Subtotal | **20** |

<u>Count Two – 18 U.S.C. § 111(a)(1)</u>

| | | |
|---|---|---|
| USSG §2A2.2(a): | Base Offense Level | **14** |
| USSG §2A2.2(b)(2)(B): | Dangerous Weapon Used | **+4** |
| **USSG §2A2.2(b)(3)(A):** | **Bodily Injury** | **+3** |
| USSG §3A1.2(a) & (b)[6]: | Victim Was Government Officer | **+6** |
| | Count 2 Subtotal | **27** |

<u>Multiple Counts</u>

| | | |
|---|---|---|
| USSG §3D1.2(c) | Counts 1 and 2 Group | |
| USSG §3D1.3(a) | (Highest Offense Level) | **27** |
| | Combined Offense Level | **27** |

---

[4] As discussed above, these guidelines calculations only address the removal of the 2J1.2 sentencing enhancements no longer available for the 18 U.S.C. § 1512(c)(2) counts in Capitol Siege post-*Brock* (U.S.S.G. § 2J1.2(b)(2) and § 2J1.2(b)(1)(B)). These calculations do not address other enhancements that may be applicable here but were not included in the Plea Agreement, such as the U.S.S.G. §2J1.2(b)(3) enhancement for destruction of a substantial number of records or especially probation records or U.S.S.G. § 3C1.1 obstruction of justice (for Nichols' destruction of phone evidence); or the U.S.S.G. §2J1.2(b)(3) enhancement for extensive in planning/preparation (for Nichols' acquisition and use of tactical gear, body armor, and a crowbar, and coordinating with Harkrider).

[5] The PSR acknowledged that Nichols' attack of MPD Officer I.D. and other officers at the Lower West Tunnel, in which Nichols sprayed OC spray over their riot shields twice while the officers were being assaulted by a crowd of rioters, created a substantial risk of serious bodily injury; however, the PSR only applied § 3A1.2(c) to Count Two and not Count One. *See* PSR ¶ 62c. This Court similarly applied U.S.S.G. § 3A1.2(c) to the defendant's obstruction of an official proceeding charge in *Worrell*. *See United States v. Worrell*, 21-cr-292, ECF 304 (Sentencing Tr.) at pp. 12-13. In *Worrell*, defendant Worrell moved to the front of a crowd facing a line of law enforcement officers on the Lower West Plaza and sprayed pepper gel directly at the group of officers. ECF 281 (Worrell Sentencing memo) at pp. 7-8.

[6] Although the PSR did add +6 to Count Two for an official victim adjustment under § 3A1.2, it did so under U.S.S.G. § 3A1.2(c). In the Plea agreement, the +6 was added pursuant to U.S.S.G. § 3A1.2(a) and (b), which is more appropriate here since the victim of the 111(a) was an officer and the offense Guideline ultimately used for Count Two is in Chapter 2, Part A (§ 2A2.2). *See* U.S.S.G. § 3A1.2(a) and (b).

Additional Adjustments

| | | |
|---|---|---|
| USSG §3E1.1(a) | Acceptance of Responsibility | **-2** |
| USSG §3E1.1(b) | Acceptance of Responsibility (Timely) | **-1** |
| USSG §4C1.1[7] | Zero-Point Offender | **0** |
| | Combined Offense Level | **24** |

Accordingly, based on an Offense Level of 24 and a Criminal History Category of I, the post-*Brock* Guidelines imprisonment range would be, 51-63 months' imprisonment. In sum, (1) the original Plea Agreement Guideline range (pre-*Brock*) is 78-97 months; (2) the PSR incorrectly calculates the post-*Brock* Guideline range as 37-46 months; and (3) the post-*Brock* plea agreement range (the plea agreement calculations minus only the two *Brock*- affected enhancements) as calculated by the government is 51-63 months' imprisonment.

### B.     Upward Variance

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c).[8] Following *Brock*, the enhancements under U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) no longer apply. But that decision does not undercut the severity of Nichols' crime—assaulting officers defending the Capitol in his attempt to stop Congress from

---

[7] Recent amendments to the Sentencing Guidelines include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case for several reasons: Nichols received a criminal history point for his prior assault conviction (*see* PSR § 69; U.S.S.G. § 4C1.1(a)(1)); Nichols "use[d] violence or credible threats of violence in connection with the offense" (U.S.S.G. § 4C1.1(a)(3)); and the crowbar Nichols carried was a dangerous weapon possessed in connection with the offense (U.S.S.G. § 4C1.1(a)(7)).

[8] The Government does not seek an upward departure in the instant case. Although the Government generally reserved the ability to request an upward departure for a federal crime of terrorism, pursuant to U.S.S.G. § 3A1.4, n. 4, such a departure is not being sought in the instant case. *See* Plea Agreement, ¶ 4(C)*.* Otherwise*,* as per the Plea Agreement, "[t]he parties agree that, solely for the purposes of calculating the applicable range under the Sentencing Guidelines, neither a downward nor upward departure from the Estimated Guidelines Range set forth above is warranted." *Id.* However, the parties reserve the right to answer any inquiries from the Court or PSR writer regarding departures considered by the Court of PSR writer "and to allocute for a sentence within the Guidelines range, as ultimately determined by the Court." *Id.* at ¶ 6.

certifying the election. *See Brock*, 2024 WL 875795, at *15 ("interference with one stage of the electoral college vote-counting process . . . no doubt endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work"). In order to impose a just and fair sentence in this case, the Court should vary upwards to sentence Nichols to 83 months' imprisonment, within the Guidelines range of 78-97 months originally contemplated in the Plea Agreement. *See* Plea Agreement, ¶ 4(C).

An upward variance is warranted to achieve an appropriate sentence under the § 3553(a) sentencing factors.[9] An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (internal citation omitted). Here, an upward variance is warranted to account for the unique nature and circumstances of the offense and to reflect the seriousness of the offense. Nichols' obstruction of an official proceeding on January 6 was a serious offense that attacked the fundamentals of American democracy using violence. Nichols' stated purpose for going to the Capitol was to stop the certification of Electoral College vote. To accomplish this objective, he broadcast—repeatedly and voraciously—his willingness to engage in violence and took steps to prepare for violence: he researched weapons restrictions in Washington; he built a carrier for firearms; he *brought firearms* with him to the greater Washington area; and he *wore body armor* in the form of a carrier with a ballistic plate along with other tactical gear, yellow-leather gloves, and steel-toed boots to the Capitol, as well as carried a walkie-talkie and a crowbar. The night before January 6, he told MPD police officers on

---

[9] The Plea Agreement authorizes the parties to seek variances. *See* Plea Agreement, ¶ 5 ("the parties agree that either party may seek a variance and suggest that the Court consider a sentence outside of the applicable Guidelines Range, based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a)").

camera that they could not stop what was coming and promised to bring violence to them the following day. On the way to the Capitol, he gave a speech in which he bayed for the blood of elected officials, including the sitting Vice President of the United States. At the Capitol, he breached the secure perimeter and—making good on his promise from the night before—then engaged in violence to accomplish his objective by—joining a push against officers and then escalating to spraying officers directly with OC spray while they were already battling with other rioters at the Lower West Tunnel. After breaching the Capitol by crawling through a smashed window, he gave another violent speech on the sill of that window in which he ordered the crowd on the Lower West Terrace to *get their weapons* to prepare for armed resistance against police and military forces who were coming to assist the overwhelmed MPD and USCP officers. And upon leaving Capitol grounds, he gave yet a fourth speech in which he called for violence, sustained terroristic resistance against the democratically elected government of the United States, and offered to be a leader of the terrorist movement that he was using his Facebook account to foment. Ryan Nichols came to Washington with a singular objective: to obstruct the lawful functions of the United States government. In furtherance of that objective: he was willing, ready, and—most importantly—able to engage in violence, whether with a crowbar, stolen chemical irritants, or firearms. Ryan Nichols offered to lead the mob in armed resistance against the democratically elected government of our Republic and, on the Lower West Terrace on January 6, 2021, he made good on that offer. In both word and deed, Ryan Nichols conduct was far more harmful or egregious than the typical case represented by the Sentencing Guidelines range as calculated by Probation or as possibly calculated by the Court post-*Brock*.

The only reason that Nichols is not subject to the relevant enhancements in § 2J1.2 is because the Sentencing Commission did not imagine that a day like January 6 could occur. As Judge McFadden stated in a pre-*Brock* sentencing hearing:

> Regardless of whether the 'administration of justice' language actually applies to this situation, *I have no doubt that the Commission would have intended for this to apply to substantial interference with an official proceeding like a certification process, which is itself more significant than almost any court proceeding*… [Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple hour delay, numerous law enforcement injuries and the expenditure of extensive resources.

*United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87 (emphasis added).

In the specific facts and circumstances of Nichols' case, an upward variance is appropriate up to the top of the Guidelines range if U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) had applied. *See United States v. Reffitt,* 21-cr-87 (DLF), Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-cr-368 (TJK), Sent'g Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *Fonticoba*, 4/11/2024 Mem. Order at 4-5 (denying motion for release pending appeal and agreeing that certification proceeding was "far more important" than "any run-of-the-mill" judicial or quasi-judicial proceeding). Accordingly, the government requests that the Court vary upwards and sentence Nichols to 83 months' imprisonment, in order to give effect to "the concerns underlying the Government's requests for these enhancements under the § 3553(a) factors at sentencing." *See United States v. Seefried*, 639 F. Supp. 3d 8, 20 (D.D.C. 2022).

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Nichols' felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Nichols planned and prepared for a "warzone" and "actual battle," and repeatedly described January 6 as a "revolution" and asserted himself as a leader in the fight. On January 6, he spewed vitriol and called for blood as he advanced down Constitution Avenue towards the Capitol, outfitted with body armor and a crowbar, shouting that "if Pence caved, we're gonna drag motherfuckers through the streets." Nichols arrived at the Lower West Terrace doors and pushed against officers in the tunnel in synchronized movements with other rioters. He called for the crowd to push forward, beckoned for a canister of chemical irritant that had been stolen from police, and then sprayed officers—twice and in a way that was designed to maximize the effectiveness of the spray. He entered the Capitol through a broken window, stood on a window ledge, and with his crowbar in one hand and bullhorn in the other, shouted at rioters "Get in the building, this is your country, get in the building, we will not be told, 'No,'" and "If you have a weapon, you need to get your weapon!," among other lawless and violent cries. After the riot, he boasted about his actions in a video he posted to Facebook "calling for violence" and exclaiming, "If you're looking for guidance in this second American revolution, I will be your leader!" Nichols subsequently destroyed physical evidence by burning the clothes he wore to the Capitol, deleting evidence from his phone and Facebook accounts, and telling his co-defendant to

delete incriminating messages. The nature and circumstances of Nichols' offenses were of the utmost seriousness, and fully support the government's recommended sentence of 83 months.

**B.**     **Nichols' History and Characteristics**

As set forth in the PSR, Nichols, a 33-year-old man, served in the United States Marine Corps from 2010 to 2014 and volunteered in disaster search and rescue operations. PSR ¶¶ 100-101. Nichols' military and community service is laudable, and the government has considered that when fashioning its recommendation to the Court. At the same time, as a former service member, and as evidenced by his ferocious exclamations, he knew that his decision to storm a guarded federal government building was unlawful. Yet, with the knowledge that police who were attempting to stop the riot were vastly outnumbered and unable to prevent the breach, created a grave risk of personal injury, property damage, and worse; he then stormed the West Front of the Capitol, pushed against officers, sprayed them with chemical spray, and exhorted the crowd to violent action. As a Marine, Ryan Nichols swore an oath to "support and defend the Constitution of the United States against all enemies, foreign and domestic." But, on January 6, he broke his oath and became the domestic enemy against our constitutional order. His veteran status and relief efforts are thus a "double-edged sword" that have aggravating as well as mitigating effects on the sentencing calculus.

Moreover, his crimes on January 6 were not an isolated event in an otherwise law-abiding life. Nichols' criminal history includes recent, violent incidents both before and after his violent behavior on January 6. In 2019, he pleaded guilty to assault causing bodily injury in Harrison County Court and was sentenced to pretrial diversion. PSR ¶ 69. In 2022, while detained in this case, he is alleged to have committed behavioral misconduct in the D.C. Jail. Nichols admitted

that he lifted a chair and "pushed it forcefully" in the incident. ECF 168-4 at ¶¶ 58-63.[10] Further,

he has a history of illegal substance use, including evidence of use around the time of the offenses.

He exchanged messages with his co-defendant about procuring and using "acid" in preparation for

his trip to Washington, D.C.

 This history, including his prior conviction for assault causing bodily injury, demonstrates

a recent pattern of violence and of disregard for the law that is fully consistent with his behavior

on January 6 and weighs in favor of a lengthy term of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

 As with the nature and circumstances of the offense, this factor supports a sentence of

incarceration. Nichols' criminal conduct on January 6 was the epitome of disrespect for the law –

using violence in an attempt to stop the peaceful transfer of power that sits at the heart of our

American democracy.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

 A significant sentence is needed "to afford adequate deterrence to criminal conduct" by

others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[11] The demands of general

---

[10] Nichols also appears to have violated the D.C. Jail's policies and procedures regarding use of social media and video-sharing. *See* https://www.washingtonpost.com/investigations/interactive/2023/trump-j6-prison-choir/ ("The first instance that the Post could find of the video online was in a March 1 tweet by a lawyer for Ryan Nichols, the defendant seen holding the camera in the video."); *see also* Exhibit L (March 1, 2023 tweet from Nichols' counsel sharing video "[f]ilmed by Ryan Nichols during his 22 month stint in pretrial detention").

[11] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### Specific Deterrence

The need for the sentence to provide specific deterrence to Nichols also weighs heavily in favor of a lengthy term of incarceration. Nichols' actions leading up, on, and after January 6, all demonstrate the need for specific deterrence. Nichols' prior conviction for assault causing bodily injury did not deter him in this case, and his misconduct at the D.C. Jail shows that he has not yet been deterred from continuing to engage in violence and criminal conduct.

In addition, although the defendant at the plea hearing accepted responsibility for his conduct, his statements shortly after January 6 were those of a man girding for another battle. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Despite everything he experienced at the Capitol, that evening he wielded a crowbar and exclaimed in a livestream video that he "st[ood] for violence" and would "make other people die." In the following days, he also chose to burn the clothes he was wearing at the Capitol, delete information from his phone, and direct his co-defendant to similarly delete messages that he felt would be incriminating. Nichols' pattern of behavior demonstrates that his sentence must be sufficient to provide specific deterrence from committing future violent crimes, particularly in light of his disregard for the law and willingness to use force to achieve political ends.

In addition, although Nichols "agreed with the conduct described in the Statement of Offense" in his presentence interview, PSR ¶ 50, in a post circulated after the plea hearing, members of Nichols' defense team refers to him as a "political prisoner." Exhibit J (Substack blog post authored by defense team law clerk present at counsel table for the plea hearing titled "Ryan Nichols: Political Prisoner Of His Own Country"); *see also* Exhibit K (GiveSendGo page titled "Free My Patriot Prisoner" with messages attributed to Nichols, his wife, and his father prior to the defendant's plea). Even prior to Nichols entering his plea, his attorney was tweeting statements that directly contradicted the statement of offense in this case. *See* Exhibit M (October 30, 2023, twitter post from Nichols' lead counsel).[12] These statements threaten "public trust in the rule of law and the criminal justice system [, which] is paramount in the context of January 6 cases." *United States v. Nester*, 22-cr-183 (TSC), ECF No. 113 at 6 (internal citation omitted). While the government does not attribute counsel's statements to the defendant himself (nor does it base its recommendation on such bombastic rhetoric), this Court must appropriately assess whether the defendant has independently accepted responsibility for his criminal conduct. Pleading guilty is not simply the same as accepting the consequences and showcasing remorse under these trying and unique circumstances.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

---

[12]  The government also notes that, in the months leading up to his plea, Nichols was claiming in public court filings that, in effect, "shadowy teams of plainclothes government agents orchestrated the attack [on the Capitol], leaving a far larger number of innocent Americans to take the fall." ECF 266 (Order Denying Defendant's Motion for Disclosure) at 13; *see also* ECF 244 (Motion for Disclosure), 245 (Supp. Motion for Disclosure), and ECF 251 (Reply to Government's Opposition to Motion for Disclosure)

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing

philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[13]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the government has selected cases that it believes to be suitable comparisons to the relevant sentencing considerations in this case. Nichols' case has many factors that distinguish it from other Capitol riot cases: the bloodthirsty nature of his rhetoric, the preparations for violence by making sure he had access to firearms in Washington and wearing a plate carrier, the scale and persistence of his assaults on and resistance against police officers on the Lower West Terrace, and his calls for sustained revolt after the attack on the Capitol—each taken independently—set Nichols apart from the vast majority of Capitol riot cases. When taken together, though, they place him into a class of his own. Although Nichols extreme conduct

---

[13] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

distinguished him from most defendants who have been sentenced in connection with January 6, the following cases are instructive as comparators.

In *United States v. Daniel Lyons Scott*, 21-cr-292 (RCL), the defendant received a sentence of 60 months' imprisonment after pleading guilty to the same charges as Nichols (18 U.S.C. § 1512(c)(2) and § 111(a)(1)). Much like Nichols, Scott planned and prepared for violence (wearing a bulletproof vest and goggles); encouraged rioters to "take the fucking Capitol"; incited and encouraged rioters throughout the day, including rioters battling officers in the Lower West tunnel, and at some point yelled at rioters through a bullhorn; found himself at the front of a mob directly across from officers; witnessed violence by other rioters against officers; personally engaged in violence against officers (Scott tackled two officers); and celebrated and boasted about his crimes the evening of January 6. Distinct from Nichols, Scott's violence helped facilitate the breach of the Senate Wing Door and Scott acted in concert with his fellow Proud Boys. *See Scott*, 21-cr-292, ECF 255. However, in the instant case, Nichols also used a dangerous weapon (OC spray) against officers; entered the Capitol Building (by climbing through a broken window); consistently used very violent rhetoric; destroyed evidence in multiple ways (burning clothes and deleting data); and told his co-defendant to delete messages. Accordingly, a longer sentence of 83 months' imprisonment would properly account for all of Nichols' additional bad behavior.

In *United States v. Duke Wilson*, 21-cr-345 (RCL), the defendant similarly pled guilty to the same charges as Nichols (18 U.S.C. § 1512(c)(2) and § 111(a)(1)). Much like Nichols, Wilson engaged in violence at the Lower West Terrace (including Wilson punching officers, attempting to take their shields, and throwing objects at them). *See Wilson*, 21-cr-345, ECF 29. Distinct from Nichols, however, Wilson was 68 years old, and had "been an upstanding citizen all [his] life." Mar. 18, 2022 Sent. Tr., ECF No. 38, at 35. Wilson also did not use a dangerous weapon against

officers; did not enter the Capitol Building; did not use consistently violent rhetoric; did not destroy physical evidence or data; and did not tell his co-defendant to delete messages, unlike Nichols. Wilson received a sentence of 51 months, at the top of his Guidelines range. Accordingly, a longer sentence of 83 months' imprisonment would properly account for all of Nichols' additional criminal behavior.

In *United States v. Sean McHugh*, 21-cr-453 (JDB), the defendant pled guilty to 18 U.S.C. § 1512(c)(2) and § 111(a)(1) and (b). Much like Nichols, McHugh prepared for violence beforehand (telling people he was going to Washington, D.C. to "fight" and "storm Congress" and bringing a cannister of bear spray); engaged in violence on the West side of the Capitol, including joining a push against officers (McHugh helped other rioters to push a large metal sign into officers) and using chemical irritant against officers; at some point used a megaphone to incite and encourage rioters; and after the riot bragged about his participation on social media. *See McHugh*, 21-cr-453, ECF 113. Distinct from Nichols, McHugh also wrestled with an officer for control of a barricade. Judge Bates sentenced McHugh to 78 months' imprisonment. However, McHugh did not enter the Capitol Building; did not consistently use extremely violent rhetoric; and did not destroy physical evidence or data or instruct a co-defendant to do so. Accordingly, a modestly longer sentence of 83 months' imprisonment would properly account for all of Nichols' additional bad behavior.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[14] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer I.D., suffered bodily injury when he was hit by Nichols' OC spray. However, Officer I.D. did not seek medical attention for his injuries and is not seeking restitution from Nichols. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Nichols must pay $2,000 in restitution, which reflects in part the role Nichols played in the riot on January 6.[15] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.)

---

[14] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[15] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Nichols' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 137.

## VIII.   FINES

The defendant's convictions for violations of 18 U.S.C. §§ 1512(c)(2) and (2) and 18 U.S.C. § 111(a)(1) subject him to a statutory maximum fine of $250,000 for Count 1 and $250,000 for Count 2.. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden Is on the defendant to show present and prospective Inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). "In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'" *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994).

Here, the defendant has not shown an inability to pay. He has not submitted the Net Worth Statement, Monthly Cash Flow Statement, and financial release forms to Probation. PSR ¶ 106. He has conducted fundraising. *See* Exhibit K. He is featured in video of the so-called choir of January 6 defendants, although it is unclear if the defendant has received any funds from his participation because organizers stated the Choir's "proceeds do not benefit families of people who assaulted a police officer." *See* https://www.billboard.com/music/chart-beat/donald-trump-j6-

prison-choir-justice-for-all-digital-song-sales-chart-1235289593/. Thus, pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). As set forth above, the corrected offense levels for Counts 1 and 2 are 20 and 27, respectively. This results in a guidelines fine range here of $15,000 to $150,000 for Count 1 and $25,000 to $250,000 for Count 2. U.S.S.G. § 5E1.2(c).

## IX.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 83 months' incarceration, a 3-year term of supervised release, restitution in the amount of $2,000, a fine, and a special assessment of $100 for each of the two felony counts of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:  */s/ Douglas B. Brasher*
DOUGLAS B. BRASHER
Assistant United States Attorney
Texas State Bar No. 24077601
Federal Major Crimes – Detailee
1100 Commerce Street, Third Floor
Dallas, Texas 75242
douglas.brasher@usdoj.gov

SARAH W. ROCHA
Trial Attorney
D.C. Bar No. 977497
601 D Street, NW
Washington, DC 20530
sarah.wilsonrocha@usdoj.gov

SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D Street, NW
Washington, DC 20530
Sean.McCauley@usdoj.gov